# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CESAR EDWIN CARBALLO,<br><br>　　　　　　　　Petitioner,<br><br>　　v.<br><br>FERETI SEMAIA, Faculty Administrator, Adelanto ICE Processing Center; ERNESTO SANTACRUZ, JR., in his official capacity, Los Angeles Field Office Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity, Secretary of the U.S. Department of Homeland Security; PAMELA BONDI, in her official capacity, Attorney General of the United States,<br><br>　　　　　　　　Respondents. | Case No. 5:25-cv-03176-SPG-AJR<br><br>**ORDER GRANTING, IN PART, EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AS TO UNLAWFUL DETENTION [ECF NO. 2]** |

Before the Court is the Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction, (ECF No. 2 ("Application")), filed by Petitioner Cesar Edwin Carballo ("Petitioner"). The Court finds the matter suitable for resolution without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS, in part, the Application.

## I. BACKGROUND

Petitioner is a noncitizen currently detained at the Adelanto ICE Processing Center and requests the Court order his immediate release. (App. at 2). He also requests the Court enjoin Respondents Fereti Semaia, Faculty Administrator at the Adelanto ICE Processing Center; Ernesto Santacruz, Jr., in his official capacity as Los Angeles Field Office Director, U.S. Immigration and Customs Enforcement ("ICE"); Kristi Noem, in her official capacity as Secretary of the U.S. Department of Homeland Security ("DHS"); and Pamela Bondi, in her official capacity as Attorney General of the United States (collectively, "Respondents"), from re-arresting him without a custody hearing and from relocating him outside the Central District of California pending final resolution of his habeas petition. (*Id.*).

### A. Factual Background

The following facts are based on declarations submitted by Petitioner in support of his Petition for Writ of Habeas Corpus, (ECF No. 1 ("Pet.")), and Application.

#### 1. Petitioner's Ties to the United States

Petitioner is a citizen of El Salvador. (ECF No. 1-2 ("Shugall Decl.") ¶ 3). In 1991, when Petitioner was a teenager, he fled El Salvador for the United States due to the ongoing civil war. (*Id.*). In 2002, Petitioner met his now wife, Monica Carballo, a United States citizen, and they married on August 7, 2006. (*Id.* ¶ 6). Together, they have two children, both of whom are United States citizens—a son who is eighteen years old, and a daughter who is ten years old. (*Id.*); (ECF No. 1-1 ("Pet. Decl.") ¶ 2). In 2016, Petitioner and his wife opened a motorcycle shop in North Hollywood, California, where he worked as the main mechanic and in-house motorcycle expert, until his initial detention by ICE on March 24, 2025. (Shugall Decl. ¶¶ 6, 7); (Pet. Decl. ¶ 2).

#### 2. Petitioner's Criminal and Removal History

In 1994, Petitioner was convicted of second-degree burglary and receipt of stolen property, in violation of California Penal Code §§ 459 and 496.1. (Shugall Decl. ¶ 4). On December 20, 1994, Petitioner was ordered deported by an immigration judge ("IJ"), and

he was deported to El Salvador on January 11, 1995. (*Id.*). Three months later, Petitioner alleges he again fled El Salvador for the United States because of repeated violence and extortion by MS-13 and 18th Street gangs. (*Id.* ¶ 5).

In 2000, Petitioner was convicted of receipt of stolen property, in violation of California Penal Code § 496A) and ordered deported to Mexico. (*Id.*). Petitioner did not provide his true identity to authorities and was prosecuted under the alias "Roberto Antonio Cruz" during these criminal and immigration proceedings. (*Id.*). According to Petitioner, he feared that he would be deported to El Salvador had he provided his true identity. (*Id.*). After being deported, Petitioner remained in Mexico for two days before he re-entered the United States in 2001 and has remained in the county ever since. (*Id.*). Since re-entering the United States, Petitioner was convicted of one misdemeanor for driving without a license in February 2010. (*Id.* ¶ 6). Outside this misdemeanor, Petitioner has had no additional contact with law enforcement since 2000. (*Id.*); (Pet. Decl. ¶ 9).

### 3. Petitioner's 2025 Removal Proceedings

On March 25, 2025, Petitioner was walking on a public sidewalk when he was arrested and detained by ICE agents. (Shugall Decl. ¶ 7). Following his arrest, ICE issued a final administrative order reinstating his December 20, 1994, deportation order pursuant to 8 U.S.C. § 1231(a)(5). (*Id.*). On April 4, 2025, a U.S. Citizenship and Immigration Services ("USCIS") officer conducted a reasonable fear interview pursuant to 8 U.S.C. § 1231(b)(3), because Petitioner asserted he feared prosecution and torture upon deportation to El Salvador. (*Id.*). On April 7, 2025, the USCIS officer found that Petitioner had not established a reasonable fear of persecution or torture. (*Id.*). Petitioner requested that an immigration judge review the USCIS officer's finding pursuant to 8 C.F.R. § 208.31, and on April 9, 2025, the IJ found that Petitioner had in fact established the requisite fear of persecution and/or torture in El Salvador. (*Id.*). Petitioner was ordered to be placed in withholding only proceedings. (*Id.*). On June 13, 2025, Petitioner filed a Form I-589 in support of his application for withholding of removal and protection under the Convention Against Torture ("CAT"). (*Id.*). On July 16, 2025, Petitioner filed a

Petition for Review before the Ninth Circuit Court of Appeals to preserve his right to review, if necessary, once his CAT application was adjudicated by the Board of Immigration Appeals ("BIA"). (*Id.* ¶ 8).

On September 23, 2025, an IJ held a bond hearing for Petitioner, ordering his release from custody on a $12,000.00 bond, as well as alternatives to detention, at the discretion of DHS. (*Id.* ¶ 9); *see also* (ECF No. 1-3 ("IJ Bond Order")). The IJ found that Petitioner was not a danger to the community because his most serious offenses were solely property-related, which occurred about twenty-five years ago, and that any flight risk posed was mitigated by Petitioner's "extensive and deep ties" to the country, such as his U.S. citizen wife and children, community support for Petitioner, and self-employment as a business owner. (IJ Bond Order at 2–3). ICE did not appeal the IJ Bond Order. (Shugall Decl. ¶ 10).

On September 25, 2025, after payment of the bond, Petitioner was released by ICE on an Order of Supervision ("OSUP"). (*Id.* ¶ 11). Petitioner's release was contingent on (1) enrollment and participation in the Intensive Supervision Appearance Program ("ISAP"), an Alternatives to Detention Program; (2) wearing a GPS ankle monitor; (3) not traveling more than seventy-five miles from his place of residence; and (4) an in-person check-in on October 15, 2025, to the ICE Office in Camarillo, California. (*Id.*). On October 15, 2025, Petitioner reported to the ICE Office in Camarillo, California, and was sent to the ISAP office. (*Id.* ¶ 12). An officer at the ISAP office informed Petitioner that from that point forward, Petitioner only needed to check in with ISAP, and did not need to appear at the ICE office. (*Id.*). The ISAP officer also told Petitioner that he was required to report to the ISAP office once every two weeks, that an ISAP officer would visit Petitioner's home once every four weeks, and that Petitioner needed to bring his passport to the next ISAP appointment. (*Id.*). Petitioner represents that, before his detention on November 3, 2025, he complied with all the conditions of his release. (*Id.*); (Pet. Decl. ¶ 6).

On October 31, 2025, the IJ held a final hearing on the merits of Petitioner's CAT application and issued an oral decision denying Petitioner withholding of removal and protection under CAT. (Shugall Decl. ¶ 15); (ECF No. 2-2 ("Valenzuela Decl.") ¶ 4). On November 3, 2025, Petitioner was prepared to appear for his ISAP check-in. (Shugall Decl. ¶ 16). Petitioner received a call from an ISAP officer, informing Petitioner to go to the ICE Office instead because ICE needed to sign off on his OSUP paperwork. (*Id.*). Following the ISAP officer's instructions, Petitioner went to the ICE office, where he was re-detained by ICE officers. (*Id.*). That day, Petitioner appealed the IJ's denial of his CAT application to the BIA. (*Id.* ¶ 17). The appeal is currently pending. (*Id.*). Petitioner is currently being held at Adelanto ICE Processing Center in Adelanto, California. (*Id.* ¶ 18).

### B. Procedural History

On November 25, 2025, Petitioner concurrently filed a Petition for Writ of Habeas Corpus, the Application, and Memorandum in Support of the Application. (Pet.); (App.); (ECF No. 2-1 ("Memo")). Petitioner raises three claims for relief. First, he argues that his detention outside of the 90-day removal period violates 8 U.S.C. §§ 1231(a)(3) and 1231(a)(6). (Pet. ¶¶ 100–06). Second, he argues his detention is arbitrary, unjustified, and punitive such that it is a substantive due process violation under the Fifth Amendment. (*Id.* ¶¶ 107–12). Third, he contends that his re-detention without a pre-deprivation hearing before a neutral arbiter, during which ICE must demonstrate a material change in circumstances, is a procedural due process violation under the Fifth Amendment. (*Id.* ¶¶ 113–20).

On November 25, 2025, upon review of the Application, the Court set a briefing schedule and hearing for the Application, with the deadline for Respondents to file a response set for November 28, 2025, the deadline for Petitioner to file a reply set for December 1, 2025, and the hearing set for December 3, 2025.[1] (ECF No. 6). Respondents

---

[1] Pursuant to the Agreement on Acceptance of Service between the Clerk of Court and the United States Attorney's Office, the Order for Response constitutes service under Fed. R. Civ. P. 4. *See* C.D. Cal. L.R. 4-4 ("In all cases where a petitioner has filed a habeas corpus

timely filed an Opposition on November 28, 2025. (ECF No. 7 ("Opp.")). Petitioner filed a Reply and Notice of Errata on December 1, 2025. (ECF No. 8 ("Reply")); (ECF No. 9 ("Errata")). Upon review of the parties' filings, the Court determined that the matter was suitable for resolution without a hearing. (ECF No. 11).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs requests for TROs. Under Rule 65, a temporary restraining order may be issued without notice to the adverse party only if "immediate and irreparable injury, loss, or damage will result to the applicant" if the order does not issue. Fed. R. Civ. P. 65(b). The "stringent restrictions" imposed by "Rule 65 on the availability of ex parte temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 438–39 (1974). Thus, ex parte temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Id.*

The standard for issuing a temporary restraining order is essentially the same as that for issuing a preliminary injunction. *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) ("[T]he legal standards applicable to TROs and preliminary injunctions are substantially identical.") (citation omitted). A plaintiff may secure a temporary restraining order upon establishing that: (1) he is likely to succeed on the merits, (2) he is likely to

---

petition under 28 U.S.C. § 2241 or a motion under 28 U.S.C. § 2255, which challenges the judgment of a federal court or a decision of a federal agency, the procedures for service of the petitions, motions, and related orders will be pursuant to the agreement between the United States Attorney's Office and the Court set forth in Appendix C to these Local Rules."); *see also Delkash v. Noem*, No. 5:25-cv-01675-HDV-AGR, ECF No. 4 (C.D. Cal. July 8, 2025) (ordering government respondents to respond to a habeas petition by a noncitizen petitioner, constituting Fed. R. Civ. P. 4 service pursuant to the Agreement on Acceptance of Service between the Clerk of Court and the United States Attorney's Office).

suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (citing *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Id.* (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

In deciding an application for a temporary restraining order, the court is permitted to consider the parties' pleadings; declarations, affidavits, and exhibits submitted in support of and in opposition to the application. *See Earth Island Inst. v. Nash*, No. 1:19-cv-01420-DAD-SAB, 2020 WL 1936701, at *6 (E.D. Cal. Apr. 21, 2020) ("[I]n considering a motion for a preliminary injunction, a court may consider and rely upon declarations, affidavits, and exhibits submitted by the parties.") (citations omitted); *Harper v. Poway Unified Sch. Dist.*, 345 F. Supp. 2d 1096, 1119–20 (S.D. Cal. 2004) (considering declarations submitted by defendants to deny plaintiff's request for a preliminary injunction); *BOKF, NA v. Estes*, 299 F. Supp. 3d 1117, 1122 (D. Nev. 2018). "The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (citations omitted). The urgency of the relief sought necessitates a prompt determination and can make it difficult to obtain admissible evidence. *Id.*

## III.     DISCUSSION

Petitioner argues that he is entitled to injunctive relief for three reasons. First, he argues that his detention on November 3, 2025, is outside the 90-day removal period set forth in 8 U.S.C. §§ 1231(a)(3) and 1231(a)(6). (Memo at 7). Second, he argues his detention is arbitrary, unjustified, and punitive such that it is a substantive due process violation under the Fifth Amendment. (*Id.*). Third, he contends re-detention without a pre-deprivation hearing before a neutral arbiter, during which ICE must demonstrate a material change in circumstances, is a procedural due process violation under the Fifth Amendment. (*Id.*).

Respondents counter that the Court lacks jurisdiction to review the government's decision to detain Petitioner. (Opp. at 5). Respondents also argue that the government is entitled to revoke an Order of Supervision "for nearly any reason," and that the IJ's October 31, 2025, denial of Petitioner's CAT application is a changed circumstance that permits his re-detention. (*Id.* at 6).

### A.     Jurisdiction

As a threshold matter, the Court addresses whether it has jurisdiction to review Petitioner's claims, all three of which contest the validity of his detention. Respondents characterize Petitioner's claim as a challenge to his removal and argue that section 1252(g) bars the Court from exercising jurisdiction over Petitioner's claim. (*Id.* at 5).

Section 242(g) of the Immigration and Nationality Act, codified as 8 U.S.C § 1252(g), provides, "[e]xcept as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g).

In *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AAADC*"), the Supreme Court instructed that section 1252(g) must be read narrowly to apply "only to three discreet

actions that the Attorney General may take: 'her decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *AAADC*, 525 U.S. 471, 482, 486 (1999) (quoting 8 U.S.C. § 1252(g)) (emphasis in opinion). The statute is not so "sweep[ing] in any claim that can technically be said to arise from the three listed actions," and thus, decisions or actions that are a part of the deportation process, but not specifically the action of commencing proceedings, adjudicating cases, or executing removal orders are not jurisdictionally barred from judicial review. *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (plurality opinion) (describing the holding of *AAADC*). The Ninth Circuit, in accordance with *AAADC*, has held that section 1252(g) "does not prohibit challenges to unlawful practices merely because they are in some fashion connected to removal orders." *Ibarra-Perez v. United States*, 154 F.4th 989, 997 (9th Cir. 2025). Instead, as it relates to the execution of removal orders, the jurisdictional bar of section 1252(g) applies to "ICE's discretionary authority to decide when or whether to execute a removal order." *Id.* (internal quotation marks and citation omitted). For example, section 1252(g) does not apply to due process claims because such claims "constitute general collateral challenges to unconstitutional practices and policies used by [the removing] agency," and do not arise from the narrowly defined decisions to "commence proceedings, adjudicate cases, or execute removal orders." *Walters v. Reno*, 145 F.3d 1032, 1052 (9th Cir. 1998) (citing *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991)).

Petitioner contests the validity of his detention, arguing that it violates both the Due Process Clause of the Fifth Amendment and the 90-day removal period set forth in 8 U.S.C §§ 1231(a)(3) and 1231(a)(6). *See* (Pet.). Contrary to Respondents' assertions, Petitioner is not challenging the Attorney General's decision to commence removal proceedings against him, to adjudicate such proceedings, or execute his removal. *See (id.)*. Nor have Respondents argued that their decision to detain Petitioner pending his removal falls into one of the three specific actions delineated in section 1252(g). Thus, under a narrow reading of section 1252(g), the Court is not jurisdictionally barred from reviewing Petitioner's claims. *E.g. Padilla v. Bowen*, No. 2:25-cv-10780-CAS-SK, 2025 WL

3251368, at *5 (C.D. Cal. Nov. 21, 2025) (finding that section 1252(g) did not bar the court from reviewing a detained noncitizen's Fifth Amendment due process claims and statutory detention claim); *Helal v. Janecka*, No. 5:25-cv-02650-HDV-JC, 2025 WL 3190132, at *2–*3 (C.D. Cal. Oct. 24, 2025) (same).[2]

### B. *Winter* Factors

The Court finds that the *Winter* factors weigh in favor of Petitioner regarding his Procedural Due Process Claim and GRANTS the Application on this ground.[3]

---

[2] In holding that 8 U.S.C. § 1252(g) does not strip the Court of jurisdiction over Petitioner's claims, the Court joins the courts in the Ninth Circuit that have uniformly found jurisdiction over claims that challenge the validity of a noncitizen's detention. *See, e.g.*, *Duong v. Noem et al.*, No. 25-cv-3142-JLS-SBC, 2025 WL 3268414, at *2 (S.D. Cal. Nov. 24, 2025) (Petitioner challenged her detention without notice and an opportunity to be heard, and did not challenge the decision to commence removal proceedings, and thus, section 1252(g) did not bar judicial review); *Tesara v. Wamsley et al.*, No. 25-cv-1723-KKE-TLF, 2025 WL 3288295, at *3 (W.D. Wash. Nov. 25, 2025) (section 1252(g) did not bar petitioner's request for "judicial review of the procedure by which he was re-detained by an ICE officer without notice and a hearing before a neutral decisionmaker"); *Duong v. Charles*, No. 1:25-cv-01375-SKO, 2025 WL 3187313, at *2 (E.D. Cal. Nov. 14, 2025) ("Because[] Petitioner's due process claim contests only his detention resulting from violations of the Government's mandatory duties under certain statutes, regulations, and the Constitution, the Court finds that it has jurisdiction to determine the lawfulness of Petitioner's detention."); *Aguilar Garcia v. Kaiser*, No. 3:25-cv-05070-JSC, 2025 WL 2998169, at *3 (N.D. Cal. Oct. 24, 2025) (Petitioner's request for "a hearing prior to his re-detention on the grounds he has a vested liberty interest in his current conditional release" was not barred from judicial review under section 1252(g)); *Maldonado Vazquez v. Feeley*, No. 2:25-cv-01542-RFB-EJY, 2025 WL 2676082, at *8 (D. Nev. Sept. 17, 2025) ("[B]ecause Petitioner challenges the lawfulness of his detention during the pendency of his removal proceedings, it is not a challenge to one of the three discrete events along the road to deportation that § 1252(g) applies to.").

[3] The Court declines to address Petitioner's substantive due process claim and statutory detention claim at this juncture. *See Sun v. Santacruz*, No. 5:25-cv-02198-JLS-JC, 2025 WL 2730235, at *5 (C.D. Cal. Aug. 26, 2025) ("[A] showing of a likelihood of success on even just one claim is sufficient for injunctive relief as long as that claim would support the injunctive relief sought.") (internal quotation marks omitted and cleaned up).

1. Likelihood of Success on the Merits

"A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998).

Petitioner argues that that under the Due Process Clause of the Fifth Amendment, he is entitled to a pre-deprivation hearing before a neutral adjudicator to determine whether circumstances have materially changed since his September 2025 release on bond and an OSUP. *See* (Memo at 14). Respondents counter that it retains discretionary authority to re-detain individuals previously released by ICE under 8 C.F.R. § 241.4(1), and may revoke an OSUP "for nearly any reason." (Opp. at 6–7). Respondents also argue that the IJ's denial of Petitioner's CAT application on October 31, 2025, was a changed circumstance warranting Petitioner's re-detention. (*Id.* at 6). The Court determines whether Petitioner has a constitutionally protected liberty interest, and if so, whether the procedures attendant to the deprivation were sufficient under *Mathews v. Eldridge*, 424 U.S. 319 (1976).

a) Constitutionally Protected Liberty Interest

Noncitizens, such as Petitioner, are protected under the Due Process Clause of the Fifth Amendment, "whether their presence here is lawful, unlawful, temporary, or permanent," and thus may not be deprived of liberty "without due process of law." *Zadvydas v. Davis*, 533 U.S. 678, 690, 693 (2001). Principal among these protections is freedom from imprisonment—"from government custody, detention, or other forms of physical restraint." *Id.* Though the government maintains "initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody, she has a protected liberty interest in remaining out of custody." *Padilla*, 2025 WL 3251368 at *6. The conditional release from custody of a noncitizen, like any individual released conditionally, vests in them "liberty [that] is valuable and must be seen as within the protection of the Fourteenth Amendment." *Morrissey v. Brewer*, 408 U.S.

1  471, 482 (1972); *Sun*, 2025 WL 2730235, at *5 (analogizing a noncitizen's release on bond to criminal parolees in *Morrissey*). A noncitizen subject to supervised release "rel[ies] on at least an implicit promise" that release "will be revoked only if he fails" to comply with the conditions of release. *Morrissey*, 408 U.S. at 482. Thus, courts throughout the Ninth Circuit have found that individuals released from immigration custody on bond have a protected liberty interest in remaining out of custody on bond. *See, e.g.*, *Perez-Mendez v. Lyons*, No. 2:25-cv-07727-VBF-RAO, 2025 WL 2970373, at *2 (C.D. Cal. Oct. 21, 2025); *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032–35 (N.D. Cal. 2025); *Prieto-Cordova v. Larose*, No. 3:25-cv-2824-CAB-DDL, 2025 WL 3228953, at *2 (S.D. Cal. Nov. 19, 2025); *Rosado v. Figueroa*, No. 25-cv-02157-PHX-DLR-CDB, 2025 WL 2337099, at *12–*13 (D. Ariz. Aug. 11, 2025), *report and recommendation adopted sub nom. Rocha Rosado v. Figueroa*, No. 25-cv-2157-PHX-DLR-CDB, 2025 WL 2349133 (D. Ariz. Aug. 13, 2025); *L.A.E. v. Wamsley*, No. 3:25-cv-01975-AN, 2025 WL 3037856, at *3 (D. Or. Oct. 30, 2025); *Garcia-Ayala v. Andrews*, No. 2:25-cv-02070-DJC-JDP, 2025 WL 2597508, at *3 (E.D. Cal. Aug. 8, 2025).

Petitioner's circumstances fit squarely within this case law. On September 23, 2025, an IJ held a bond hearing for Petitioner, found that he was not a flight risk or a danger to the community, and ordered his release from custody under bond of $12,000, as well as alternatives to detention, at the discretion of DHS. (Shugall Decl. ¶ 9); (IJ Bond Order). The government did not appeal Petitioner's release on bond, and on September 25, 2025, after payment of bond, Petitioner was released by ICE on an OSUP. (Shugall Decl. ¶¶ 10, 11). Petitioner represents that he has complied with all the conditions of his release. (Pet. Decl. ¶ 6). He has enrolled and participated in ISAP, worn a GPS ankle monitor, limited his travel within a seventy-mile radius from his residence, and dutifully complied with the required check-ins with his ISAP officer. (*Id.*); (Shugall Decl. ¶¶ 11–12). Respondents have not argued to the contrary. Petitioner therefore has a protected liberty interest in his release on bond, which may not be taken away without a hearing before a neutral arbiter. *See Morrissey*, 408 U.S. at 483–84 (The decision to revoke release "need not be reached

unless there is first an appropriate determination that the individual has in fact breached the conditions of parole.").

Respondents do not recognize that Petitioner has a protected liberty interest in his release on bond. Instead, Respondents characterize Petitioner's release as a purely discretionary decision that may be revoked "for nearly any reason" under 8 C.F.R. § 241.4(l). (Opp. at 6–7). Petitioner, for his part, argues that 8 C.F.R. § 241.41(l) does not govern the revocation of his supervised release because he was released pursuant to an order by an IJ. (Memo at 22).

8 C.F.R. § 241.4(l), in relevant part, provides that a noncitizen "released under an order of supervision or other conditions of release who violates the conditions of release may be returned to custody . . . . Release may be revoked in the exercise of discretion when, in the opinion of the revoking official: (i) [t]he purposes of release have been served; (ii) [t]he alien violates any condition of release; (iii) [i]t is appropriate to enforce a removal order or to commence removal proceedings against an alien; or (iv) [t]he conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate." 8 C.F.R. §§ 241.4(l)(1)–(2). The authority to revoke release is not unlimited; as recognized by the BIA, "where a previous bond determination has been made by an immigration judge, no change should be made by [DHS] absent a change of circumstance." *Matter of Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981).

Though 8 C.F.R. § 241.4(l) may govern Petitioner's release, it does not abrogate the Fifth Amendment's fundamental guarantee of due process of law. *See Zadvydas*, 533 U.S. at 690, 693; *see also Young v. Harper*, 520 U.S. 143, 148 (1997) (Recognizing that though a parolee's liberty is "limited," it does not "render such liberty beyond procedural protection."). As relevant to Petitioner's claim for relief, the revocation of release must comport with principles of due process, and upon payment of bond, Petitioner had a vested liberty interest in his conditional release.[4] *Morrissey*, 408 U.S. at 482.

---

[4] Although Respondents argue that the IJ's October 31, 2025, denial of Petitioner's request for withholding of removal pursuant to the Convention Against Torture is a changed

-13-

          *b)*    *Sufficiency of Procedures Provided*

Having found that Petitioner has a protected liberty interest in his release on bond, the Court evaluates whether the procedures attendant to the revocation of his OSUP were adequate.

The Ninth Circuit has assumed without deciding, and district courts have followed, that the *Mathews v. Eldridge* balancing test applies. *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206–1207 (9th Cir. 2022); *e.g. Sun*, 2025 WL 2730235, at *5 (applying the *Mathews v. Eldridge* test to a released noncitizen seeking to enjoin ICE from re-detaining her without a pre-deprivation hearing); *Guillermo M. R. v. Kaiser*, 791 F. Supp. 3d 1021, 1029–37 (N.D. Cal. 2025) (the *Mathews v. Eldridge* test applied to a noncitizen who was released on bond and re-detained without a hearing); *Arzate v. Andrews*, No. 1:25-cv-00942-KES-SKO-HC, 2025 WL 2230521, at *4–*5 (E.D. Cal. Aug. 4, 2025) (same). Therefore to evaluate sufficiency of procedures attendant to Petitioner's deportation proceedings, the Court will balance: (1) "the private interest affected by the official action"; (2) "the risk of erroneous deprivation of such interest through the procedures used"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Rodriguez Diaz*, 53 F.4th at 1206–07 (citing *Mathews*, 424 U.S. at 335).

First, as described above, Petitioner has a substantial liberty interest in remaining out of custody on bond. Petitioner represents he has complied with the terms of his OSUP and thus relied on Respondents' implicit promise that his supervised release was conditioned on his compliance. (Pet. Decl. ¶ 6); (Shugall Decl. ¶¶ 11–12).

Second, Petitioner has also established a high-risk of erroneous deprivation. Petitioner is currently detained at the Adelanto ICE Processing Center, (Pet. Decl. ¶ 1), and the record does not indicate that Petitioner received notice or a hearing before his OSUP

---

circumstance that justifies Petitioner's re-detention, *see* (Opp. at 6), the revocation of release still must comport with principles of due process before he is re-detained.

was revoked. This risk is particularly high because an IJ recently held that Petitioner was not a danger to the community or a flight risk due to his "extensive and deep ties to the United States." (IJ Bond Order at 2). Moreover, Respondents did not appeal Petitioner's release on bond. *See* (Shugall Decl. ¶ 10). Yet Respondents take the position that it "is allowed to revoke [an Order of Supervision] for nearly any reason," without "other procedural [or] meaningful substantive limit on this exercise of discretion." (Opp. at 6). With such authority, Respondents would never need to appeal a bond decision and could unilaterally impose restrictions on non-citizens released on bond, outside the purview of administrative courts and federal courts alike. *See Guillermo M. R.*, 791 F. Supp. 3d at 1035. Due process principals do not permit such unreviewable determinations. *See Zadvydas*, 533 U.S. at 692 ("[T]he Constitution may well preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights.") (internal quotation marks and citation omitted). A hearing before a neutral adjudicator thus guards against any arbitrary or erroneous deprivation of Petitioner's liberty interest in remaining on bond.

Third, the government's interest in re-detaining Petitioner without a hearing is low, particularly as Petitioner represents he has complied with all terms of his OSUP release and has checked in with ISAP two to four times a month since his release. (Pet. Decl. ¶¶ 6, 8); *see Castillo-Hernandez v. Bondi*, No. 25-cv-2662-JGB-MAA, 2025 WL 3190887, at *5 (C.D. Cal. Oct. 28, 2025) ("The government's previous decision to release Petitioner on an OSUP demonstrates that the government found that Petitioner was not a danger to the community and that his presence in future immigration proceedings could be ensured by alternative conditions.") (internal quotation marks and citation omitted).

Therefore, upon balancing the *Mathews v. Eldridge* factors, Petitioner is likely to succeed on the merits of his Fifth Amendment procedural due process claim.

2. <u>Irreparable Harm</u>

Petitioner has shown that absent injunctive relief in the form of a pre-detention hearing, he continues to suffer irreparable injury. "[T]he deprivation of constitutional

-15-

rights unquestionably constitutes irreparable injury," including those "imposed on anyone subject to immigration detention." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (citing *Melendres v. Arpaio*, 694 F.3d 990, 1002 (9th Cir. 2012)). Absent injunctive relief in the form of a pre-detention hearing, not only is Petitioner being deprived of due process under the Fifth Amendment, his detention is impacting his physical and emotional health. *See Barker v. Wingo*, 407 U.S. 514, 532–33 (1972) (Incarceration "has a detrimental impact on the individual" because "it often means loss of a job" and "disrupts family life."). According to Petitioner, when he was first detained, he "struggled with depression and anxiety," became ill and lost nineteen pounds, and did not have access to clean drinking water. (Pet. Decl. ¶¶ 3, 4). Petitioner claims members of his family are also suffering due to Petitioner's continued detention without a hearing. Petitioner represents that, after he was first detained on March 24, 2025, his wife was forced to close their motorcycle shop, and Petitioner's daughter began to see a therapist because she was having suicidal thoughts. (*Id.* ¶ 2). Further, Petitioner contends that, due to Petitioner's re-detention, Petitioner's wife is struggling to support the family financially, and Petitioner's daughter and son are suffering emotionally. (*Id.* ¶ 10); *see also Sun*, 2025 WL 2730235, at *7 (recognizing that re-detention of a noncitizen Petitioner would "prevent her from helping support her family financially and emotionally" and risk imposing "a significant hardship on [Petitioner] and her family.").

### 3. Balance of the Equities and Public Interest

The balance of equities and public interest merge when the Government is the party opposing the relief sought. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," and "[t]he government also cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).

In sum, Petitioner has shown that he is likely to succeed on the merits of his Fifth Amendment claim, wherein his due process rights were violated when he was detained

without a pre-deprivation hearing. *See* (Memo at 28). He has also demonstrated that he and his family will suffer significant hardship absent some injunctive relief. (Pet. Decl. ¶¶ 2, 10). As recognized by other courts in this Circuit, in the context of immigration detention proceedings, the harm to Petitioner is "significant," while the potential harm to the government is "minimal." *See Pablo Sequen v. Kaiser*, 793 F. Supp. 3d 1114, 1120 (N.D. Cal. 2025) ("The only potential injury the government faces is a short delay in detaining [the petitioner] if it ultimately demonstrates to a neutral decisionmaker by clear and convincing evidence that her detention is necessary to prevent danger to the community or flight."). On balance, the *Winter* factors therefore weigh in Petitioner's favor. The Court thus GRANTS, in part, Petitioner's Application for a Temporary Restraining Order based on his Procedural Due Process Claim insofar as it seeks a bond hearing.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS, in part, Petitioner's Application and hereby ORDERS as follows:

1. Respondents are ORDERED to provide Petitioner with a bond hearing before a neutral decisionmaker, at which the government, to continue with detention, must demonstrate that there has been a material change in circumstances since Petitioner was released on bond on September 25, 2025, that justifies detention.

2. Petitioner must serve a copy of this Order, as well as all supporting pleadings and papers, on Respondents within twenty-four (24) hours of entry of this Order.

3. Respondents are ORDERED TO SHOW CAUSE why a preliminary injunction should not issue at an in-person hearing on Wednesday, December 10, 2025, at 9:00 a.m. in Courtroom 5C. Petitioner shall file an opening brief and related submissions no later than December 5, 2025, at 5:00 p.m. Respondents shall file a response no later than Tuesday, December 9, 2025,

at 5:00 p.m.  The Court will accept a stipulated briefing schedule extending these dates on the condition that the parties agree to an extension of the TRO.

**IT IS SO ORDERED.**

DATED:  December 3, 2025

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE